IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ALENA GERHARDT,
TYRIN PACHECO,

     **Plaintiffs,**

                                      **No.**

**vs.**

**THE CITY OF HOBBS,
MATTHEW OLENICK,
ANDREW LANE,
ALEJANDRO RIVAS,
VALERIE CHACON, and
THE FIFTH JUDICIAL
DISTRICT ATTORNEY'S
OFFICE,**

     **Defendants.**

## COMPLAINT

Plaintiffs Alena Gerhardt ("Gerhardt") and Tyrin Pacheco ("Pacheco") (collectively, "Plaintiffs"), by and through undersigned counsel, bring this Complaint for damages and in support state as follows:

## PRELIMINARY STATEMENT

1.    This case concerns law enforcement's months-long, inter-departmental conspiracy to arrest and prosecute Plaintiffs for crimes they did not commit, all as punishment for Plaintiffs' having the gall to stand up for their rights. Fortunately for Plaintiffs, as described below, Defendants' methods resembled those of Inspector Clouseau more than Inspector Javert, and all charges against Plaintiffs have (finally) been dismissed. Nonetheless, Plaintiffs have endured months of harassment and deprivation of their most fundamental rights including right to counsel. In this civil lawsuit, Plaintiffs seek relief and recompense for this abridgement of their rights.

**PARTIES, JURISDICTION AND VENUE**

2.      Plaintiff Alena Gerhardt is a resident of Lea County, New Mexico.

3.      Plaintiff Tyrin Pacheco is a resident of Lea County, New Mexico.

4.      Defendant the City of Hobbs (the "City" or "Hobbs") is a municipality located in Lea County, New Mexico.  The City of Hobbs is the supervising entity for HPD

5.      Defendant Andrew Lane ("Lane") is a law enforcement officer employed by HPD. On information and belief, he is a resident of Lea County, New Mexico.

6.      Defendant Matthew Olenick ("Olenick") is a law enforcement officer employed by the City of Hobbs Police Department ("HPD").  On information and belief, he is a resident of Lea County, New Mexico.

7.      Defendant Alejandro Rivas ("Rivas") is a law enforcement officer employed by HPD.  On information and belief, he is a resident of Lea County, New Mexico.

8.      Defendant Valerie Chacon ("Chacon") is the city attorney for Hobbs.  At times, Chacon has purported to act as a special assistant district attorney for the Fifth Judicial District Attorney's Office.  On information and belief, Chacon is a resident of Lea County, New Mexico.

9.      Defendant the Fifth Judicial District Attorney's Office is one of thirteen judicial districts in New Mexico empowered by the State of New Mexico to prosecute persons for criminal offenses on the State's behalf.  The Fifth Judicial District's jurisdiction includes Eddy County, Chaves County, and Lea County.

10.      This Court has subject matter jurisdiction because suit is brought against Defendants under 42 U.S.C. § 1983.

11.      This Court has personal jurisdiction because all Defendants reside in the State of New Mexico, and the conduct complained of occurred in New Mexico.

12.      Venue is proper in this court as all the acts and omissions that form the basis of this

2

complaint occurred in the State of New Mexico.

13. A notice of claim under the New Mexico Tort Claims Act and the New Mexico Civil Rights Act was timely provided on January 9, 2025.

## STATEMENT OF FACTS

**A. Rivas, Lane, and Olenick arrest Gerhardt for DWI on false pretenses, and Olenik lies about it in a criminal complaint.**

14. Late in the afternoon of July 13, 2024, Gerhardt was leaving her home for work when she inadvertently crashed her car into a mailbox and parked car in a residential neighborhood.

15. Gerhardt had not been drinking or taking drugs prior to this incident, though she admittedly lost control of the vehicle.

16. Tire tracks from her car were visible on an adjacent sidewalk. The tire tracks were clearly from Gerhardt's vehicle, as the tire tracks led directly from that sidewalk, to where her vehicle had come to rest near the front yard of a home.

17. The car's airbags deployed during the accident, dazing Gerhardt and causing pain in her head.

18. Shortly after the incident, Defendant Olenick arrived at the accident scene and interviewed Gerhardt about what happened.

19. Gerhardt told Olenik that she had been driving to work and was very upset following an argument with her family. Gerhardt told Olenik she had not consumed any drugs or alcohol. Gerhardt was crying and rubbing her head due to the impact of the airbags.

20. Some other HPD officers arrived including Defendants Lane and Rivas.

21. Olenik told Rivas what he had learned.

22. Rivas asked Olenik, "Any impairment?" Olenik replied, "No. Just kind of lack of paying attention."

23. Olenick reiterated to his fellow officers that he was "not seeing any impairment," and that he was "not smelling anything either."

24. Olenick told the other officers he could not think of a crime to charge Gerhardt with beyond traffic offenses.

25. Olenick asked Gerhardt to submit to a field sobriety test, to which Gerhardt consented.

26. Prior to starting the test, Gerhardt told Olenik that her face hurt where it had been struck in the accident.  Olenik promised to "account for that[.]"

27. During the test, Olenik issued a series of confusing instructions to an already-upset Gerhardt, telling her to count, raise her leg, and walk in a line in various alternating orders. Gerhardt was crying much of the time Olenik was issuing the instructions.

28. During the test, Gerhardt felt frustrated that she was being subjected to the field sobriety test, and she made statements reflecting her frustration to the officers.

29. After Gerhardt finished the test, Olenik told Lane and Rivas that Gerhardt "didn't really have any nystagmus."  ("Nystagmus" is rapid, rhythmic eye movement that indicates intoxication.)

30. Rivas asked Olenik, "Do you smell an odor?"  Olenik replied, "I don't."

31. Olenick told Lane and Rivas, "Everything else I saw look[ed] like she was just annoyed she had to go through [the test]."

32. Olenick added that Gerhardt's head injury and distressed emotional state were further evidence that she was simply upset, not intoxicated.

33. Olenik told his fellow officers that he "didn't really have anything else" to support a DWI charge.

34. Despite Olenik's statements, Lane and Rivas mused about the possibility Gerhardt

4

was impaired.  For example, Lane posited that he smelled some sort of sweet odor coming from Gerhardt.  Olenik countered that "I don't smell anything, that's the problem."

35.    Lane also pointed out that Gerhardt had not precisely obeyed Olenik's confusing field sobriety test instructions about turning around in straight line steps.  To be clear, Lane's point was not that Gerhardt's balance was impaired.  Lane's point was that Gerhardt had not stepped in the exact manner/order in which Olenik requested.

36.    Olenik, swayed by peer pressure from Rivas and Lane and his displeasure with Gerhard's attitude, arrested Gerhardt for Driving While Under the Influence of Intoxicating Liquor ("DWI").

37.    In his July 15, 2024 sworn criminal complaint against Gerhardt, Olenik stated (i) that Gerhardt had "bloodshot watery eyes"; (ii) that no "injuries that would indicate a head injury" were present; (iii) "Distinct and Sustained Nystagmus" were present; (iv) he "observed slight slurring from Alena as she spoke"; and (v) smelled "the odor of intoxicating liquor emanating from [Gerhardt's] person."

38.    Each of these statements by Olenik was false.  As to (ii), Gerhardt was clearly experiencing a head injury from the airbag deployment.  As to (i) and (iv), Olenik's reference to "bloodshot watery eyes" and "slight slurring" are contradicted by the body camera footage and also by Olenik's own statements to his fellow officers that Gerhardt showed no signs of impairment.  As to (iii), Olenik's statement in the criminal complaint that Gerhardt had "distinct and sustained nystagmus" is the exact opposite of what he told his fellow officers (contemporaneously), that she "didn't really have any nystagmus."  And as to (v), Olenik told the other officers on scene—repeatedly—that he did not smell alcohol.

39.    Despite these false statements, Olenick signed the criminal complaint against Gerhardt for DWI.

**B.    Officers arrest Gerhardt's boyfriend, Pacheco, because Pacheco annoyed them.**

40.    From the time officers first arrived on the scene, both officers and bystanders walked around the portion of the sidewalk where Gerhardt's car had left tire tracks before hitting the mailbox.

41.    No HPD officer ever ordered the bystanders not to walk on the sidewalk, and several HPD officers were themselves walking on the tire tracks.

42.    No HPD officer was taking pictures of the tire tracks, or taking physical samples from the tracks' dirt.

43.    Officers did not place yellow caution tape around the tire tracks, or anywhere else on the scene.  Indeed, it would have made no sense to protect the tire tracks as the car that made the tracks (Gerhardt's car) was only 30 feet away.  There was no question which car the tracks belonged to.  Nor was there a question about which direction her car had been going—it was going toward the mailbox.

44.    As Olenick arrested Gerhardt, Gerhardt requested that the police give her phone to her boyfriend, Pacheco.

45.    Pacheco came forward and volunteered to take her phone and other personal possessions.  In doing so, Pacheco crossed the area of the sidewalk with the tire tracks, coming toward Olenik, Gerhardt, and a female officer.

46.    Olenik told Pacheco to "hold on" on the sidewalk and not approach the police cruiser, presumably because Olenik did not want Pacheco to interfere with Gerhardt's arrest. Pacheco obeyed this instruction.

47.    Pacheco and Olenik argued about the speed with which Olenik and his fellow officers were transferring Gerhardt's phone to Pacheco.  Pacheco was on the sidewalk while this argument took place.

6

48.    Gerhardt requested that her phone be given to her father, who was also nearby. Olenik complied with Gerhardt's request and gave the phone to her father.

49.    Olenik stepped on the sidewalk with the tire tracks to give the phone to Gerhardt's father.  As he was doing so, Pacheco remained on the sidewalk.

50.    Olenik stepped aside to speak with Gerhardt's father, and Pacheco (still on the sidewalk) continued to voice his displeasure to Rivas and Lane about the speed with which the officers were giving him Gerhardt's possessions.

51.    Annoyed with Pacheco, Rivas told Pacheco to go away and quit talking to them. Pacheco said he had a right to stand on a public sidewalk.

52.    It was at this point that Rivas and Lane conjured up the pretext that Pacheco was standing in an "accident scene" and must leave.  This of course made no sense as many bystanders and officers (including Gerhardt, Pacheco, Rivas, and Olenik) had been walking all over the supposed accident scene.

53.    Rivas did not issue an order to Pacheco.  Rather, he said, "I'm just asking you," and "can you move back?"  Pacheco reasonably interpreted these statements to be requests, not orders. Pacheco did not wish to comply with these requests, as he was indeed standing on a public sidewalk.

54.    Pacheco and the officers continued to argue, though at no time did Pacheco threaten the officers physically.  All Pacheco was doing was standing on the same sidewalk where others including Olenik had been walking only moments earlier.

55.    At this point Lane and Rivas handcuffed Pacheco and arrested him for disobeying their "lawful" order that Pacheco step away from the public sidewalk, and for tampering with evidence.

56.    The criminal complaint against Pacheco, signed by Defendant Officer Lane,

contained a number of false statements.

57.    First, the criminal complaint stated that the area with the tire tracks "was ending processing for the DWI investigation and directly assisted in establishing the vehicles [*sic*] path of travel."  This was not true because the tire tracks had nothing to do with "processing" the DWI investigation.  To the extent the tire tracks "establish[ed] the vehicles [*sic*] path," this was so whether or not Pacheco or anyone else walked on the tire tracks.  Indeed, there was no question about which direction the vehicle was going.

58.    Second, the criminal complaint stated that Pacheco "disturbed" evidence from the crime scene (dirt, one supposes), but this is not true.  Pacheco disturbed no evidence.  To the extent Pacheco's feet touched or moved some of the dirt from the tracks, other bystanders and officers including Olenik himself had disturbed the dirt before Pacheco, so Pacheco was not the one who "disturbed" anything.

59.    Third, the criminal complaint stated that Pacheco "balled up his fists" toward an officer, but that was not true.

60.    Fourth, the criminal complaint stated that officers ordered Pacheco to leave the sidewalk, but that was not true.  The officers requested Pacheco to voluntarily leave the sidewalk, a request that Pacheco rightly refused.

61.    Finally, despite tampering with evidence being a specific intent crime, there was no indication that Pacheco ever knew he was standing on or near tire tracks, and no indication Pacheco was intending to hinder any investigation.

62.    In reality, the officers' arrest of Pacheco was completely pretextual and motivated solely by their having taken offense at Pacheco's being rude to them.  The officers had no lawful basis to order him to step away from the sidewalk.

63.    The officers also lacked no probable cause to believe Pacheco committed any

crimes.

64.    On information and belief, no one from HPD ever put up caution tape around the public sidewalk or investigated the tire tracks in any way.

65.    After their arrests, Gerhardt and Pacheco were jailed, and charges were filed against them in Hobbs Municipal Court. The case was not referred to the Fifth Judicial District Attorney's Office.

**C.    The City drops charges against Gerhardt and Pacheco after Gerhardt files a Motion to Suppress.**

66.    On or around August 12, 2024, the City provided access to body camera footage of the subject incident to Plaintiffs' counsel.  The footage was made available via Clio, which is the case management system used by the Hobbs City Attorney's Office. On October 11, 2024, the City uploaded additional footage, which was also made available to Plaintiffs' counsel.

67.    Plaintiffs' counsel conducted pretrial interviews over Zoom, as part of their defense of the criminal cases. A prosecutor from the Hobbs City Attorney's Office was present for these interviews.

68.    During the interviews, Olenik was confronted about the contradictions between his sworn criminal complaint and body cam footage.

69.    On October 31, 2024, Plaintiffs and their counsel attended a pre-trial hearing in municipal court.

70.    Prior to the hearing, Plaintiffs' counsel told City prosecutors that the body camera footage showed Defendant Olenik had made false statements in his criminal complaint, and that Pacheco had not committed a crime.  Plaintiffs' counsel urged the City to dismiss the charges. However, the City prosecutors refused.

71.    The municipal court set trial for November 21, 2024.

72. On November 13, 2024, the City filed a Motion to Continue the November 21 trial. The Motion's stated basis for a continuance was that Defendant Lane was out of state for training.

73. The Motion stated, "We are good on time, as this matter is set to run on January 13, 2025." The City was referring to the six-month deadline to have a trial under State law and speedy trial precedent.

74. The Motion to Continue was granted, and trial was re-set for December 12, 2024.

75. On December 9, 2024, Gerhardt filed a Motion to Suppress Evidence, outlining the misstatements in the criminal complaint as described above, and arguing that due to the lack of probable cause, evidence collected after her arrest had to be suppressed.

76. The City never responded to Gerhardt's Motion to Suppress. Instead, later in the day on December 9, the City prosecutors filed Nolle Prosequi's as to all charges against Gerhardt and Pacheco, dismissing the cases without prejudice.

77. Two days later, on December 11, Plaintiffs' counsel sent an email to City prosecutor and Defendant in this lawsuit, Chacon, asking if the City wished to discuss pre-suit resolution of Ms. Gerhardt and Mr. Pacheco's civil claims stemming from the City's unlawful arrests and prosecutions. Chacon did not respond.

78. In late December 2024, Plaintiffs' counsel began drafting a civil complaint against Defendants. As part of the drafting process, Plaintiffs' counsel had to review documents in the case files on Clio.

79. However, Plaintiffs' counsel noticed that their access to the files had been revoked.

80. On December 30, 2024, Plaintiffs' counsel emailed Heather Bara ("Bara"), a City of Hobbs employee, to request restored access to files related to the Gerhardt and Pacheco cases.

81.     Ms. Bara responded saying that the cases were "closed on our side," and that she would re-open and share the case files with Plaintiffs' counsel.

**D.     Chacon, the City, and the District Attorney's Office conspire to punish Plaintiffs for exercising their rights by prosecuting them again and not telling their attorneys.**

82.     On December 31, 2024, the Fifth Judicial District Attorney's Office filed criminal informations in Lovington District Court based on the same events as the municipal court cases.

83.     The criminal informations were signed by Megan Kirtley, a deputy for District Attorney Dianna Luce.

84.     The informations were accompanied by "amended" probable cause affidavits that removed (some) of the false statements in the municipal court affidavits.

85.     No one from the City or Fifth Judicial District Attorney's Office notified Gerhardt, Pachecho, or their counsel that the cases had been refiled.

86.     On December 31, 2024, the district court judge set a first appearance for Gerhardt for January 7, 2025.  Notice was sent by the court to the Fifth Judicial District Attorney's Office and the Public Defender's Office. On information and belief, it was not sent to Gerhardt or her counsel.

87.     On January 6, 2025, City prosecutor Chacon filed an entry of appearance in the Gerhardt case, stating that she was appearing as a "Special Assistant District Attorney."  The Entry of Appearance included a certificate of service saying that the document was served on "all parties of record[.]"  The certificate of service was signed by City employee, Ms. Bara.  Yet, the Entry of Appearance was not served on Gerhardt or her counsel.

88.     Chacon's Entry of Appearance also did not include a special prosecutor appointment, or any indication that she had taken the required oath of office to prosecute cases on

11

the State of New Mexico's behalf.

89.     Chacon was acting beyond the scope of her authority by purporting to prosecute Gerhardt in district court.

90.     On January 7, 2025, at 10:14 AM New Mexico time, Plaintiffs' counsel received a call from a clerk in Judge Kirksey's chambers, asking if counsel was Gerhardt's attorney.  The clerk stated she noticed that counsel's name had been associated with the municipal court case.

91.     This was the first time Plaintiffs' counsel heard anything about the case against Gerhardt being re-filed in district court.  The last Plaintiffs' counsel had heard, the municipal court case had been dismissed on December 9 after Gerhardt filed the motion to suppress.

92.     Plaintiffs' counsel asked the court clerk if she could check to see if Pacheco's case was also refiled.  She confirmed it was.

93.     At 11:52 AM on January 7, 2025, Chacon filed a "Motion to Expedite Hearings" in Gerhardt's case.  The motion asked the district court to hold a trial on the merits "prior to January 16, 2025," as that was the date Chacon now calculated the six-month rule would run (compared to the Motion to Continue, which listed the six-month deadline as January 13).

94.     The Motion to Expedite did not contain a certificate of conference.  Rather, it stated "New Mexico Court records does [*sic*] not show the Defendant as having Counsel at this time."

95.     This was a false statement. Chacon *knew* Plaintiffs had counsel, as counsel had emailed her on December 11, 2024, asking if she wished to discuss resolution of Plaintiffs' civil claims.  This is in addition to Chaon's other dealings with Plaintiffs' counsel on this matter as described above.  Plaintiffs' counsel had also emailed Chacon's subordinate on December 30, 2024, asking for access to Clio to be restored.

96.     The Motion to Expedite was accompanied by a certificate of service stating that

12

all parties of record had been served with the document.  This was another false statement.  The Motion was never served on Gerhardt or her counsel.

97.     At 11:59 AM on January 7, 2025, Plaintiffs' counsel received an email from Chacon that stated in full:  "I have noticed you have not filed an EOA in the district court matter. I am not sure if you are representing Ms. Gerhardt in this matter as well, but she is set for first appearance today at 12:45p.m. [*sic*] in front of Judge Kirksey."

98.     On information and belief, Chacon only sent this email because she knew that the Court had contacted Plaintiffs' counsel about the hearing.

99.     The first appearance was indeed held at 12:45 PM. and lasted around 20 minutes. Plaintiffs' counsel attended over Google Meet.  As Gerhardt never received notice, she was not present.

100.     Chacon purported to appear for the State of New Mexico at the hearing, even though a special prosecutor appointment had not been filed, and she had not taken the required oath.

101.     At the hearing, Judge Kirksey expressed bafflement at Chacon's request for a trial in less than 9 days.  Judge Kirksey remarked there was no chance this could work given the court's busy schedule.

102.     Plaintiffs' counsel asked the court to reset the arraignment, given that Gerhardt had not received notice.  The court granted this request and set a first appearance for January 14, 2025.

103.     After the hearing, Plaintiffs' counsel emailed Chacon and inquired:  "[W]hat are you doing here?  Candidly, you're just walking the city into higher damages for malicious prosecution.  I really don't get it.  Please confirm by 5:00 tomorrow that you are dismissing the cases against Ms. Gerhardt and Mr. Pacheco.  They should not have to file additional motions to

13

put an end to these baseless prosecutions."

104. Chacon did not respond.

105. On January 8, 2025, Gerhardt's counsel filed a response to the Motion to Expedite, explaining there was not enough time to have the trial before the six-month term expired.

106. Gerhardt's counsel also pointed out that Chacon had no authority to appear for the State in district court as no special prosecutor appointment had been made or filed. Plaintiffs requested that all pleadings signed by Chacon in district court—including the motion—be struck.

107. On January 9, 2025, following up on the response, Plaintiffs' counsel emailed Chacon, District Attorney Luce, and others at the City and the Fifth Judicial District Attorney's Office and protested (again) the ongoing harassment of his clients as outlined above.

108. On January 10, 2025, on or around 12:51 PM, the District Attorneys' Office filed an "Appointment of Special Prosecutor" document into the docket for the district court cases, purporting to appoint Chacon (belatedly) as a special prosecutor. The appointment document included an oath of office, signed by Chacon and a district court judge as witness on January 10, 2025.

109. A couple hours after the special prosecutor appointments were filed, the District Attorney's Office dismissed all charges against Pacheco and Gerhardt.

***

110. The only reasonable interpretation of the above events is that the City set out to punish Plaintiffs for the December 11, 2024 email inviting the City to discuss pre-suit resolution of their civil claims.

111. As part of the City's scheme, Chacon asked the District Attorney's Office to let her play special prosecutor in sham district court proceedings against Gerhardt and Pacheco. Chacon and the City knew the refiled cases would never lead to a trial, but a trial was not their goal.

14

The City and Chacon wanted Plaintiffs to fail to appear for arraignment (because they had no notice). That would cause the district court to issue bench warrants and give the Hobbs Police Department an excuse to arrest Gerhardt and Pacheco again. Under the City's Inspector Clouseau-like scheme, Gerhardt and Pacheco would learn their "lesson" for daring to exercise their rights.

112. On information and belief, the District Attorney's Office was aware that the prosecutions against Plaintiffs were baseless, and that Chacon wanted the cases filed in district court for an improper purpose.

113. Plaintiffs have now learned that as of January 15, 2025, Chacon announced her resignation as City Attorney for the City of Hobbs.

114. There are other indicators of Defendants' malicious intent. On information and belief, the City took away Clio access from Plaintiffs' counsel to further the ruse that the cases were over, when in fact Defendants were gearing up to refile the cases in district court.

115. It is also notable that Defendant Olenik signed another criminal complaint for filing in the district court case. On information and belief, Chacon requested Olenik do this to "cure" the false statements from the municipal court so that she could not be accused of re-filing a criminal complaint known to be false.

116. In sum, what began as a young woman accidentally hitting a mailbox has spawned a multi-jurisdiction conspiracy that calls into question the credibility and legitimacy of the criminal justice system in Hobbs and Lea County.

## COUNT I: NEW MEXICO CIVIL RIGHTS ACT, VIOLATIONS OF ARTICLE 2, §§ 4, 10, AND 14 OF THE NEW MEXICAN CONSTITUTION

### Brought against the City of Hobbs and the Fifth Judicial District Attorney

117. Plaintiff incorporates all foregoing paragraphs as if fully stated here.

118. The New Mexico Civil Rights Act creates a private cause of action against public bodies to redress the violation of a person's civil rights by government actors employed by a public

15

body or a person acting on behalf of a public body under color of law.

119.    At the time of the incident, Olenick, Lane, and Rivas (collectively, the "Defendant Officers") were wearing full HPD uniforms and badges of office.

120.    The Defendant Officers detained and arrested Plaintiffs in furtherance of their official duties.

121.    The Defendant Officers were acting under color of law at all relevant times.

122.    Article 2, § 10 of the New Mexican Constitution states, "The people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures, and no warrant to search any place, or seize any person or thing, shall issue without describing the place to be searched, or the persons or things to be seized, nor without a written showing of probable cause, supported by oath or affirmation."

123.    Defendant Officers violated Plaintiffs' right to be secure in their person and free from unreasonable search and seizure when they wrongfully detained/arrested Plaintiffs.

124.    Defendant Officers did not have probable cause to arrest Plaintiffs. Defendant Officers did not have a lawful basis upon which to arrest Gerhardt. Defendant Officers did not have a lawful basis to arrest Pacheco.

125.    Lane and Olenick violated Plaintiffs' rights when they filed criminal complaints against Plaintiffs using false statements.

126.    Olenick knew there was no probable cause that Gerhardt had driven while impaired. Lane knew there was no probable cause that Pacheco had resisted, evaded, or obstructed an officer or tampered with evidence.

127.    Plaintiffs were falsely arrested and falsely imprisoned due to the criminal complaints signed by Olenik and Lane.

128.    The Defendant Officers' actions caused Plaintiffs to be prosecuted and confined.

129.    Olenik and Lane acted with malice in signing the criminal complaints against Plaintiffs.

130.    The Defendant Officers violated Plaintiffs' right to "seek and obtain safety and

16

happiness" under Article 2, § 4 of the New Mexican Constitution by wrongfully detaining them and having them jailed and prosecuted.

131. The Defendant Officers caused Plaintiffs harm, including the infliction of pain and suffering, mental anguish, and the loss of enjoyment of life.

132. The City of Hobbs is liable for these harms pursuant to the New Mexico Civil Rights Act, NMSA § 41-4A-3.

133. The Fifth Judicial District Attorney's Office deprived Plaintiffs of their right "to appear and defend [themselves] in person, and by counsel" under Article 2, § 14 of the New Mexican Constitution by filing criminal charges against Plaintiffs and not informing their counsel.

134. The Fifth Judicial District Attorney's Office deprived Plaintiffs of their right "to appear and defend [themselves] in person, and by counsel" under Article 2, § 14 of the New Mexican Constitution by filing criminal charges against Plaintiffs that they knew to be baseless.

135. Chacon caused Plaintiffs harm by putting them in further jeopardy, as well as inflicting pain and suffering and mental anguish.

136. Chacon was acting as part of her official duties and under color of state law when she did this.

137. The Fifth Judicial District Attorney's Office is liable for these harms pursuant to the New Mexico Civil Rights Act, NMSA § 41-4A-3.

## COUNT II: NEW MEXICO TORT CLAIMS ACT, BATTERY, FALSE ARREST, FALSE IMPRISIONMENT, ABUSE OF PROCESS AND MALICIOUS PROSECUTION

### Brought against the City of Hobbs, Olenik, Lane, and Rivas

138. Plaintiffs incorporate all foregoing paragraphs as if fully stated here.

139. New Mexico Tort Claims Act, § 41-4-12 waives sovereign immunity for battery, false arrest, false imprisonment, abuse of process and malicious prosecution against a person by a law enforcement officer.

140. The Defendant Officers battered Plaintiffs when they detained them.

17

141.    By detaining Plaintiffs, Defendant Officers touched Plaintiffs in a rude, angry or insolent manner.

142.    The Defendant Officers' touching of Plaintiffs was not privileged or excusable in any way.

143.    The Defendant Officers' touching of Plaintiffs caused them harm.

144.    Olenik and Lane filed criminal complaints against Plaintiffs with knowledge that there was no probable cause to support the charges against Plaintiffs.  The criminal complaints contained false statements, which Olenik and Lane knew to be false when made.

145.    Due to this wrongful conduct, Plaintiffs have suffered injuries including but not limited to physical injuries, pain and suffering, mental anguish, and the loss of enjoyment of life.

146.    Defendant Officers and the City are liable for this wrongful conduct by the law enforcement officers as well as all harms caused thereby.

147.    Defendant Officers and the City are also responsible for the malicious prosecution of Plaintiffs.

148.    The conduct described herein constitutes abuse of the judicial process.

## COUNT III:  42 U.S.C. § 1983, VIOLATION OF FOURTH AND SIXTH AMENDMENTS OF UNITED STATES CONSTITUTION

### Against Chacon, Olenik, Lane, Rivas, and the City of Hobbs

149.    Plaintiff incorporates all foregoing paragraphs as if fully stated here.

150.    The Fourth Amendment of the United States Constitution guarantees persons the right not to be wrongfully arrested.  The Sixth Amendment of the United States Constitution guarantees persons accused of crimes the right to counsel.

151.    The Defendant Officers violated Plaintiffs' Fourth Amendment rights by arresting them without probable cause.  Defendants Olenik and Lane violated Plaintiffs' Fourth

18

Amendment rights further by lying in their respective criminal complaints.

152. Defendants Olenik and Lane assisted Chacon in the wrongful prosecution of Plaintiffs.

153. Defendant Chacon violated Plaintiffs' right to counsel by filing criminal charges against them in district court and not notifying counsel of same, even though Chaon knew Plaintiffs to be represented by counsel.

154. Chacon further violated Plaintiffs' rights by prosecuting them for charges she knew to be unsupported by probable cause.

155. Due to these acts, Plaintiffs have suffered injuries including but not limited to physical injuries, pain and suffering, mental anguish, loss of enjoyment of life, and loss of income.

156. Olenik and Lane acted with malice in signing the respective criminal complaints.

157. Chacon acted with malice by re-filing charges against Plaintiffs in district court and depriving Plaintiffs' of their right to counsel and due process.

158. The City of Hobbs is liable under *Monell v. Department of Soc. Svcs.*, 436 U.S. 658 (1978) due to its custom, policy or practice of arresting people for being rude to police officers, using false statements in criminal complaints, and retaliating against people for taking legal action against the City of Hobbs.

159. The City of Hobbs is further liable for its failure to train its police officers and city attorneys,

160. The City of Hobbs' actions and omissions were a moving force behind Plaintiffs' constitutional injuries.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court to enter an order granting Plaintiffs the following relief.

a.      Enter a Judgment against Defendants finding that they are liable to Plaintiffs;

b.      Award compensatory damages for all of Plaintiffs' claims;

c.      Award punitive damages for all of Plaintiffs' claims;

d.      Award the costs and expenses of this case, including attorneys' fees;

e.      Award pre-judgment and post-judgment interest;

g.      Award all other further and general relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demands a jury on all issues so triable.

Date:  February 3, 2025

Respectfully submitted,


WGLA, LLP

*/s/ Benjamin Gubernick*
Benjamin Gubernick
 New Mexico Bar No. 145006
 Ben@wglawllp.com
346-277-0287
Curtis Waldo
curtis@wglawllp.com
717 Texas St., Suite 1200
Houston, TX 77002