**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

ALENA GERHARDT,
TYRIN PACHECO,

     **Plaintiffs,**

                         **No. 2:25-cv-00110-DHU-GBW**

v.

THE CITY OF HOBBS,
MATTHEW OLENICK,
ANDREW LANE,
ALEJANDRO RIVAS,
VALERIE CHACON, and
THE FIFTH JUDICIAL
DISTRICT ATTORNEY'S
OFFICE,

     **Defendants.**

**PLAINTIFFS' RESPONSE TO MOTION FOR PARTIAL SUMMARY
JUDGMENT OF DEFENDANTS CITY OF HOBBS, MATTHEW OLENICK,
ANDREW LANE, AND ALEJANDRO RIVAS**

Plaintiffs Alena Gerhardt ("Gerhardt") and Tyrin Pacheco ("Pacheco") (collectively, "Plaintiffs") file this Response to the Motion for Partial Summary Judgment, filed by Defendants City of Hobbs, Matthew Olenick, Andrew Lane, and Alejandro Rivas ("Defendants") [Dkt. #65], on May 22, 2026.

## I.    PRELIMINARY STATEMENT

Defendants' Motion boils down to, who are you going to believe, me, or your lying eyes?[1]  The body camera footage says: "Any impairment?"  "No.  Just kind of lack of

---

[1] *Duck Soup* (1933).

paying attention." "I'm not seeing any impairment on her." "I'm not smelling it." "I'm not smelling anything either." "She didn't really have any nystagmus." "Everything else seemed like she was just annoyed she had to go through with it [the field sobriety test]." Yet, in the criminal complaint, and in Defendants' Motion, "the odor of intoxicating liquor emanat[es] from her person"; "I observed [Gerhardt] to have Distinct and Sustained Nystagmus"; and "her poor performance on the Standard Field Sobriety Tests."

Which is it? What Olenik said on the video, or what his lawyers drafted nearly two years later?

Pacheco is an even simpler case. Pacheco obeyed officers' instructions to stop on a public sidewalk. "That's fine," Maxwell told him. Seconds later, the same public sidewalk is an "accident area" and Pacheco is in handcuffs, all because officers did not like Pacheco's demeanor. Lane compounded the issue by lying in his criminal complaint as the City continued to prosecute Pacheco for something that never happened.

The bottom line is Defendants did not have probable cause to arrest Plaintiffs on July 13, and they certainly did not have probable cause to continue to prosecute Plaintiffs in the days and months thereafter. Qualified immunity does not afford Defendants the right to lie in a criminal complaint, and it provides zero protection against Plaintiffs' state law claims. Qualified immunity also does not get around the central fact questions at issue: Why did Maxwell supposedly smell alcohol on Gerhardt when the officer who spent the most time with her, Olenik, did not? Did

Gerhardt actually fail her sobriety test, or was Olenik just recasting her performance after the fact to justify arresting her?  Did Olenik really detect nystagmus, or was his contemporaneous assessment of no nystagmus correct?   Was Gerhardt's speech slurred, or was she shaken by the crash?  Did officers give Pacheco sufficient warning to leave the supposed accident area before arresting him?

Probable cause is a fact-intensive inquiry reserved for the jury in civil cases. *DeLoach v. Bevers*, 922 F.2d 618, 623 (10th Cir. 1990) ("[I]t is a jury question in a civil rights suit whether an officer had probable cause to arrest.").  With all reasonable inferences resolved in Plaintiffs' favor, summary judgment must be denied.

## II.    RESPONSE TO DEFENDANTS' UMF

The majority of Defendants' lengthy "Undisputed Material Facts" ("UMF") are characterizations of what is on body camera footage that is itself summary judgment evidence.  Plaintiffs dispute Defendants' UMF to the extent the facts therein are inconsistent with the body camera footage.  Plaintiffs further dispute as follows:

1.  Plaintiffs dispute Paragraph 6.  Plaintiffs do not hear Maxwell saying anything about marijuana on the body camera footage.  Marijuana is a distinct smell, and no one else has suggested Gerhardt smelled like marijuana.

2.  Plaintiffs dispute Paragraph 7.  Gerhardt's speech was not "slightly slurred."

3.  Plaintiffs dispute Paragraph 10.  Olenik did not tell the three men anything about needing to step back.  The three men were no closer to the accident scene than were the women.  Plaintiffs dispute the notion that upon their arrival at the scene,

3

officers were urging bystanders to stay away or to step back.  That is not reflected on the body camera footage.

4.  Plaintiffs dispute Paragraph 11.  Pacheco did curse at officers, but Plaintiffs dispute the characterization in Paragraph 11 that this happened as Olenik "began investigating" as it implies Pacheco was obstructing officers' investigation, which he was not.  Olenik had already started his investigation when Pacheco arrived. Plaintiffs further state that Pacheco's statements, while critical of officers, could not reasonably be construed as threats.

5.  Plaintiffs dispute Paragraph 12.  This paragraph contains multiple typographical errors, so it is hard to understand what is being conveyed, but Plaintiffs disputes Gerhardt admitted what Defendants say she admitted.

6.  Plaintiffs dispute Paragraph 13.  Olenik did not merely say he "did not really smell anything to indicate impairment."  UMF at ¶13.  Olenik said "I'm not seeing any impairment," and "I'm not smelling anything either," referring to alcohol.  *See* AUMF, *infra*.  Plaintiffs also dispute that one of the men wanted to fight officers.

7.  Plaintiffs dispute Paragraph 22.  Gerhardt did not "interrupt" the HGN.

8.  Plaintiffs dispute Paragraph 23.  It is not clear what Defendants are saying here due to a potential typographical error.  Plaintiffs dispute that Gerhardt indicated signs of impairment.

9.  Plaintiffs dispute Paragraph 26.  Plaintiffs do not understand this paragraph. It starts by saying Olenik was trained to detect clues of impairment, but then says

clues include "starting in the correct position."—*i.e.*, a clue of impairment is obeying Olenik's instructions.  This does not make sense.

10. Plaintiffs dispute Paragraph 27 to the extent Defendants are implying Gerhardt failed the sobriety test by stepping out of the instructional position.  It was not clear Olenik was instructing Gerhardt to stay permanently in the same position, so "stepping out" is hardly indicative of failure in any respect.

11. Plaintiffs dispute Paragraph 28 to the extent Defendants are implying Gerhardt failed the heel-to-toe portion of the sobriety test.  Defendants are mischaracterizing Gerhardt's performance.  As can be seen from Lane's BWC (around 5:55), Gerhardt did not step out of line on step five; she did not end on the wrong foot; she did not fail to turn properly; she did not break heel-to-toe on step six of the return.[2]

12. Plaintiffs dispute Paragraph 31.  Gerhardt did not prematurely start the test. Olenik told Gerhardt to raise her leg until he told her to stop, and Gerhardt obeyed his instruction.  Lane BWC at 6:55.  It was Olenik who jumped the gun and told Gerhardt to raise her leg before Olenik started his timer.  *Id.*

13. Plaintiffs dispute Paragraph 32.  Olenik did not advise that Gerhardt presented with mild nystagmus.  Olenik said Gerhardt "didn't really have any nystagmus."  Olenik said he could smell a sweet odor and specifically said he did not

---

[2] Defendants' characterization of Gerhardt's heel-to-toe performance is copied and pasted exactly from Olenik's criminal complaints.  Defendants are in a tough spot here.  Defendants cannot describe Gerhardt's performance accurately without implicitly conceding Olenik lied in his criminal complaints.  Using Olenik's own criteria from ¶¶18-20 of his Declaration, and comparing that to the body camera footage, Gerhardt does not appear impaired at all.  That is why Olenik told his fellow officers at the time that he saw no indication of impairment.

smell alcohol.  Olenik said nothing to his fellow officers about how Gerhardt failed the test, whether due to not obeying instructions or any other reason.  To the extent Olenik detected *mild* nystagmus, he attributed it to Gerhardt's head injury.  *See* AUMF, *infra.*

14. Plaintiffs dispute Paragraph 33.  The body camera footage does not reflect Lane saying anything about smelling alcohol.  Lane does list some ways that Gerhardt may not have followed officers' instructions on the sobriety test, but he does not say Gerhardt failed the test.

15. With respect to Paragraph 34, Plaintiffs dispute Torres smelled alcohol on Gerhardt.  Torres was not close to Gerhardt when she was "yelling at…Lane."  Dkt. #65-11, ¶6.  Torres' statement is not credible.  A reasonable inference from the body camera footage is that Torres thought Gerhardt had caused a mess and was acting rudely, so he wanted an excuse to arrest her.  Torres may also be relying on Maxwell's earlier statement.  Further, Torres is on camera earlier saying he did not perceive Gerhardt to be impaired.  Torres BWC at 2:15.

16. Plaintiffs dispute Paragraph 35.  Olenik did not determine Gerhardt was impaired.  He had literally just said the opposite.  *See* AUMF, *infra.*

17. Plaintiffs dispute Paragraph 37.  Olenik never commanded Pacheco to "step out of the scene" or do anything similar.  In fact, Olenik engaged with Pacheco for several seconds while Pacheco was supposedly in the "scene" (*i.e.*, the public sidewalk), and never told Pacheco he could not be on the sidewalk.  This contributed to Pacheco's confusion when Lane later told Pacheco he could not be on the public sidewalk.

18. Plaintiffs dispute Paragraph 39. This is a sentence fragment, and Plaintiffs do not understand what assertion is being conveyed.

19. Plaintiffs partially dispute Paragraph 43. In Olenik's second criminal complaint, he added that Maxwell was the source of the "she smells like alcohol" information (see Dkt. #65-5 at middle of page 2). He also added that Lane was the one who observed nystagmus. *See* Dkt. #65-5 at bottom of page 5.

20. Plaintiffs dispute Paragraph 44. The district court filed a Notice of **First** Appearance—*i.e.*, an order that Plaintiffs (then defendants) appear. *See* Dkt. #65-16.

21. Plaintiffs agree the referenced emails contain the cited language. Plaintiffs dispute Paragraph 46 to the extent Defendants are implying Chacon learned of the district attorney's actions only on January 2, 2025. Plaintiffs contend Chacon knew of the filing earlier. Plaintiffs asked Chacon about this during her deposition, but Chacon invoked attorney-client privilege and declined to answer.[3]

22. Plaintiffs agree with Paragraph 52 that no claim lies against Rivas. Plaintiffs contend the correct Defendant should be Torres, and Plaintiffs will move to amend their complaint and replace Rivas with Torres.

III. ADDITIONAL UNDISPUTED MATERIAL FACTS

1. The evening of July 13, 2024, Gerhardt was driving too fast while trying to make a turn at an intersection. Her car hit a mailbox and parked car, and the airbag struck Gerhardt's head when it deployed.

---

[3] Dkt. #65-18, at 27:19-22 ("Q: Were you aware that this was going to happen, the cases were going to be filed? A: I cannot divulge information that I've received through attorney-client privilege.").

7

2.  Olenik was first to arrive on the scene.  When Sergeant Torres arrived, Torres asked Olenik, "any impairment?"  Torres BWC at 0:50.  Olenik responded, "No.  Just kind of lack of paying attention."  *Id.*  Ninety seconds later, Olenik repeated, "I'm not seeing any impairment on her," and Torres responded, "me neither."  *Id.* at 2:15.

3.  Sergeant Maxwell was also present and asked Olenik, "did she admit to drinking?"  Olenik shook his head, no, and said, "I'm not smelling it."  Maxwell BWC at 2:10.  Olenik further said, "I'm not seeing any impairment," and "I'm not smelling anything either."  Olenik BWC at 10:00, 10:20, respectively.

4.  Maxwell later told Torres that Gerhardt smelled like alcohol to her.  Maxwell BWC at 2:25.  Olenik had walked away at this point and did not hear Maxwell's remark.  *Id.* at 2:15.  Maxwell had separately told Gerhardt that she was recusing herself from the investigation.  *Id.* at 1:40.

5.  Gerhardt completed the sobriety test without indication of any impairment.  According to the factors outlined by Olenik's Declaration (¶¶ 18-20), Gerhardt was not impaired.  She walked heel-to-toe, maintaining balance, counting correctly, and turned around and did the same again.  Lane BWC at 5:55.  Similarly, in the portion of the test where Gerhardt raised her leg, she did not display any sign of impairment.

6.  After conducting the sobriety test, and after spending several minutes in Gerhardt's vicinity, Olenik told Torres and Lane that Gerhardt "didn't really have any nystagmus."  With respect to the results of the sobriety test, Olenik told Torres and Lane, "Everything else that I saw made it seem like she was just annoyed she had to go through with it."  Lane BWC at 8:30.

7. Torres asked Olenik whether Olenik smelled an odor. Olenik said, "I don't." *Id.* Olenik said he smelled something sweet, but not alcohol. *Id.* at 8:35. Lane listed some instructions he claimed Gerhardt did not follow during the sobriety test. *Id.* at 8:45. Olenik responded, "But I don't smell anything, is the problem." *Id.* at 8:55. Olenik expounded, "All I'm smelling is like a sweet smell, but it's not to me like an alcohol smell." *Id.* at 9:05. Olenik cited Gerhardt's head injury as a potential explanation for why she was shaken up. *Id.*

8. Olenik proceeded to arrest Gerhardt for DWI, anyway, on suggestion of Torres. *Id.* at 9:15; Torres BWC at 12:40 (Torres to Olenik: "Go book her up").

9. Olenik handcuffed Gerhardt and took her to a police vehicle. At this time, Pacheco walked from a nearby front yard to the public sidewalk toward Gerhardt to collect Gerhardt's phone. Olenik BWC at 21:35.

10. As Pacheco reached the sidewalk, Olenik told Pacheco to stop. *Id.* Pacheco obeyed Olenik's instruction and stopped where he was, on the public sidewalk. *Id.*

11. Olenik then spoke to Pacheco and said he would give Gerhardt's phone to Pacheco. *Id.* at 21:45. Olenik did not tell Pacheco he could not be on the sidewalk, or anything about how Pacheco should stay on the grass, or about an accident area. *Id.*

12. Olenik left to talk to Gerhardt's father, and other officers continued to talk with Pacheco. Maxwell told Pacheco, "You can go." Maxwell BWC at 14:00. Pacheco said, "I can stand right here; it's a public sidewalk." *Id.* Maxwell replied, "That's fine." *Id.* at 14:05.

13. Torres interrupted Maxwell and for the first time suggested Pacheco might not be permitted to stand on the public sidewalk due to its being "part of the accident area." Torres BWC at 14:35. Torres requested but did not command Pacheco to leave the public sidewalk. *Id.* Confused by Torres' reference to an accident area, Pacheco repeated, "it's a public sidewalk." Maxwell BWC at 14:30.

14. Around the same time Torres was requesting Pacheco leave the sidewalk, Lane closed in on Pacheco and started saying, "Step back." *Id.*

15. Shortly after, Torres arrested Pacheco for resisting, evading, and obstructing ("REO"). Torres BWC at 14:55. Pacheco asked him what he was being arrested for, and Torres repeated his statement about Pacheco being in an accident area. *Id.* at 15:00.

16. Throughout all the body camera footage, one can see numerous officers including Maxwell, Torres, Lane, Rivas, and Olenik, walk through the area of the sidewalk where Pacheco supposedly was not allowed to stand. Officers were taking no precautions to preserve the dirt on the sidewalk. At no time was there any crime scene tape around the sidewalk where Pacheco was standing or anywhere, either before or after Pacheco was arrested.

17. In addition, the body camera footage shows bystanders (other than Pacheco) standing on the same area of sidewalk where Pacheco was arrested. For instance, at 16:50 of Maxwell BWC, Gerhardt's dad is standing in the same spot where Pacheco apparently could not be, without incident. *See also* Lane BWC at 11:05 (dad standing in supposed accident area); *id.* at 0:55 (Gerhardt walking in supposed accident area).

10

18. On or around July 15, 2024, Olenik signed a criminal complaint against Gerhardt. Dkt. #65-4. The complaint stated that Gerhardt had "bloodshot water eyes"; no "injuries that would indicate a head injury"; and "Distinct and Sustained nystagmus." The complaint referenced a sweet odor but did not include Olenik's view that the odor was not alcohol. To the contrary, on page 5 of the criminal complaint, Olenik stated that Gerhardt had the "odor of intoxicating liquor emanating from her person." Olenik claimed Gerhardt stepped out of line during the heel-to-toe portion of the sobriety test, and he says she performed poorly on the test.

19. On or around July 15, 2024, Lane signed a criminal complaint against Pacheco for resisting, evading, and obstructing an officer ("REO") and tampering with evidence. Dkt. #65-7. The criminal complaint stated Pacheco was "immediately ordered to step back by officers to preserve the tire markings and disturbed dirt streaks across the sidewalk that [Pacheco] was attempting to walk across." *Id.* at 2. Lane wrote of "evidence that became disturbed by [Pacheco] walking through the area." *Id.* Lane wrote Pacheco was "repeatedly ordered to step away from the scene." *Id.* He said "[t]hree different officers gave a total of approximately twelve commands for [Pacheco] to step away from the active scene." *Id.* at 3.

20. Via counsel Ben Gubernick, Gerhardt and Pacheco filed a motion to suppress on December 9, 2024, based on the false statements in the criminal complaints. *See* Dkt. #65-12; Ex. A (Gubernick Decl.). On that same day, the City dismissed all charges against Gerhardt and Pacheco. Ex. A.

11

21. On December 11, 2024, Mr. Gubernick emailed Ms. Chacon, asking if the City was interested in having settlement discussions regarding Gerhardt and Pacheco's civil claims. *Id.* Ms. Chacon never responded. *Id.*

22. On December 30, 2024, to prepare the current civil complaint, Mr. Gubernick emailed City employee, Heather Bara, and asked if the City could restore access to the files relating to Plaintiffs' criminal case. *Id.* Ms. Bara responded that the "cases were closed from our side," and she would restore access. *Id.*

23. Unbeknownst to Mr. Gubernick, on December 31, 2024, the Fifth Judicial District Attorney's Office filed new criminal informations on Gerhardt and Pacheco. *Id.*

24. The new criminal information against Gerhardt contained a new affidavit from Olenik. Dkt. #65-5. In the new criminal complaint, Olenik added that Lane, not Olenik, had observed the nystagmus, and he added that Maxwell, not Olenik, had smelled the alcohol. *Id.*

25. With respect to Pacheco, it was Torres, not Lane, who signed a new criminal complaint. Torres' complaint contained the same statement as Lane's that Pacheco was "immediately ordered to not approach and step away from the area." Dkt. #65-8, at 5. Despite officers' supposed warnings, Pacheco "refused to step away several times." *Id.* Torres references eight (8) additional warnings from Lane. *Id.* at 6. According to Torres, it was only after all these warnings that he arrested Pacheco. *Id.*

26. The morning of January 7, 2025, an employee for the district court called Mr. Gubernick and informed him that his clients had a first appearance later that day.

Ex. A.   This was the first Mr. Gubernick had heard about the re-filed criminal complaints.  *Id.*

27. Later that morning, after the district court had already called Mr. Gubernick, Ms. Chacon emailed Mr. Gubernick and asked if he was still representing Gerhardt because she had a first appearance later that day.  *Id.*

28. At the first appearance on January 7, 2025, the district court told Ms. Chacon it was unrealistic for Ms. Chacon to expect a trial to be set within the next ten (10) days to comply with the speedy trial rule.  Dkt. #65-17, at 4-5.  Ms. Chacon had no logical response for why or how a trial might be set on such short notice.  *Id.*

## IV.   ARGUMENT

### A. Legal Standard

Summary judgment is appropriate only if the moving party shows there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  The moving party bears the initial burden of identifying those portions of the record that it believes demonstrate the absence of a genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).  If the movant fails to meet this burden, summary judgment must be denied.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) ("The court should give credence to the evidence favoring the nonmovant....").  Only once the movant satisfies its burden does the burden shift to the nonmoving party to set forth specific facts showing a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  In considering a

13

motion for summary judgment, the court must view the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). At the summary judgment stage, courts may not weigh evidence or assess credibility. *Anderson*, 477 U.S. at 255.

## B. Defendants had no probable cause to arrest Gerhardt for DWI.

"A warrantless arrest is permissible when an officer has probable cause to believe that a person committed a crime." *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (internal quotations omitted). "Probable cause to arrest exists only when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Id.* That belief must be anchored in a "substantial probability"—as opposed to "a bare suspicion"—that an offense took or is taking place. *Patel v. Hall*, 849 F.3d 970, 981 (10th Cir. 2017) (internal quotation marks omitted). "As a corollary…of the rule that the police may rely on the totality of facts available to them in establishing probable cause, ***they also may not disregard facts tending to dissipate probable cause***." *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988) (emphasis added).

Here, officers encountered a woman who hit a mailbox and parked car. She had veered off the road after going too fast through a turn. She was frazzled, and her head had been hit by an airbag. There were no witnesses, no camera footage of the incident. Gerhardt said she had not been drinking, and no one claimed to have seen her drinking. There were no liquor bottles in her car; no evidence of drug

14

paraphernalia; nothing apart from the crash itself to suggest Gerhardt might be impaired.[4]

To support probable cause for DWI, officers relied on a supposed liquor smell, nystagmus in the eyes, and a failed sobriety test. But upon cursory inspection, this "evidence" is highly dubious. The officer who spent the most time with Gerhardt—Olenik—said not just once or twice but five times, at different time intervals, that Gerhardt did not smell like alcohol. *Cf.*, *Bigford*, 834 F.2d at 1218 (officers "may not disregard facts tending to dissipate probable cause"). Olenik conducted an HGN test on Gerhardt for more than a minute and concluded she had no nystagmus. And Olenik, the officer who actually conducted the sobriety test, concluded Gerhardt was simply "annoyed she had to do it."[5]

And consider the supposed observations of Maxwell, Lane, and Torres. Maxwell[6] was with Gerhardt (and other people) for a brief second, compared to Olenik who spent several minutes in Gerhardt's immediate presence. Maxwell also now claims to smell marijuana, a distinct smell that no one else detected. And Maxwell never

---

[4] One can imagine a driver being so impaired she cannot control her car and runs it into a mailbox, but not even Defendants claim Gerhardt was at that level of intoxication. Something else must have been going on with Gerhardt that caused her to veer off the road. Yet officers seemed utterly uninterested in finding out what that was and instead focused laser-like on whether she smelled like alcohol.

[5] Defendants also point to Gerhardt's alleged refusal of chemical testing, but that occurred after Olenik had already arrested her. Post-arrest conduct cannot retroactively create probable cause for the arrest. At most, the refusal might bear on later charging, but only if the initial DWI arrest was lawful and supported by probable cause.

[6] Maxwell's input should not be taken into account because of her personal relationship with Gerhardt, which is why Maxwell recused herself at the outset. Maxwell BWC at 1:40.

shared her observation about an alcohol smell with Olenik, who had already walked away. Lane and Torres are even further out on a limb. Lane's assessment of Gerhardt's sobriety test is closer to spit-balling than objective assessment—he seems to be looking for a way to please his superior, Torres, who was looking for some reason to arrest Gerhardt. What Lane says about the sobriety test matches Gerhardt's actual performance. Contrary to Defendants' UMF, Lane never said Gerhardt smelled like alcohol. It was Torres who said Gerhardt smelled like alcohol, though he made this assessment standing 20 feet away from her. To the extent Torres smelled anything coming from Gerhardt, it was likely the sweet odor already identified by Olenik, but a sweet odor does not mean alcohol. On a young woman like Gerhardt going to work, a sweet odor could be perfume or shampoo. A reasonable inference is that Torres was merely relying on Maxwell's earlier statement that she smelled alcohol, that Torres never smelled anything, and that Maxwell was latching on to the sweet odor and assuming it was alcohol.[7]

Defendants speculate that there was probable cause to arrest Gerhardt for reckless driving, but this too is wrong. Under New Mexico law, reckless driving is defined as "willful and wanton" disregard. N.M. Stat § 66-8-113(A). The "willful and wanton" requirement means more than a showing that some traffic rule was violated. *State v. Clemons*, 2006-NMCA-031, ¶16 ("speed alone, or speed accompanied by

---

[7] It is hard to imagine that in such circumstances, officers were detecting two different odors from Gerhardt. It was likely one odor that Maxwell quickly concluded was alcohol, and that a more discerning Olenik recognized as a general sweet smell, not alcohol.

16

inadvertence, or speed accompanied by acts of mere negligence…does not meet the test of [reckless driving]") (internal quotations and citations omitted). "Willful and wanton" requires probable cause that Gerhardt acted *willfully* with respect to the risk of hurting property or person. Caselaw abounds with examples of these sorts of joyriders—a driver laughing as he careens into another vehicle;[8] a child stealing a car and driving it into a dumpster;[9] a man driving 70 mph in a residential neighborhood and on the wrong side of highway.[10] In all these cases, there was reason to believe the drivers knew what they were doing as they were driving "carelessly and heedlessly." That intent is critical to a reckless driving charge. Compare that to Gerhardt. No witnesses saw Gerhardt driving, let alone stealing a car or taunting anyone. The crash was not captured on video. True, Gerhardt should not have driven onto the sidewalk, but that hardly means she acted in a "willful and wanton" manner.

Defendants misread N.M. Stat. § 66-8-125. The statute does not say that any driver involved in an accident may be arrested whenever an officer can identify some traffic infraction. It removes the ordinary "in the officer's presence" requirement for misdemeanor arrests where, at the scene of an accident, the officer has reasonable grounds based on personal investigation to believe the person committed a crime. The underlying offense must still be supported by probable cause and must be arrestable. Under N.M. Stat. 66-8-123, for a routine traffic infraction, officers must give the motorist chance to sign a citation before arresting them. Section 125 does

---

[8] *State v. Munoz*, 2014-NMCA-101.
[9] *State v. Jesenya O.*, 2021-NMCA-030, rev'd on other grounds by 2022-NMSC-014.
[10] *State v. Richerson*, 1975-NMCA-027.

not overturn this rule; otherwise, it would say so.  More broadly, though, Defendants did not arrest Gerhardt for running a stop sign.  They arrested her because of the DWI charge.  Even if officers could arrest Gerhardt under Section 125, that only affects the false arrest portion of Gerhardt's Fourth Amendment claim, not the malicious prosecution portion.  *See infra.*

At the end of the day, even with qualified immunity,[11] where "there is room for a difference of opinion…it is a jury question in a civil rights suit whether an officer had probable cause to arrest."  *DeLoach*, 922 F.2d at 623 (internal quotations omitted). For all the reasons stated above, there is certainly "room for a difference" with respect to Gerhardt.

## C. Defendants had no probable cause to arrest Pacheco.

Pacheco was arrested for REO and tampering with evidence.  With respect to the former, the New Mexico Court of Appeals has interpreted the phrase "resisting or abusing" in section 30–22–1(D) to forbid three types of conduct: (1) "physical acts of resistance," *State v. Wade*, 667 P.2d 459, 460 (N.M. Ct. App. 1983); (2) the use of "fighting words," *id.* at 461; and (3) the refusal to "obey" lawful police commands. *New Mexico v. Diaz*, 908 P.2d 258, 259–62 (N.M. Ct. App. 1995); *see also State v. Jimenez*, 392 P.3d 668, 682 (N.M. Ct. App. 2017) (resisting under subsection (D)

---

[11] After finding no probable cause, the second inquiry for purposes of qualified immunity is whether the law was clearly established.  In this case, "[t]he law was and is unambiguous: a government official must have probable cause to arrest an individual."  *Cortez*, 478 F.3d at 1117.

"refers not only to a defendant's overt physical act, but also to the failure to act when refusing to obey lawful police commands[.]").

Here, there was no probable cause that Pacheco committed REO. First, there was no clear command from officers. For instance, at Torres BWC 14:30, *et seq.*, Torres says, "If you could please step back…if you can go ahead and move back please. I'm just asking you." At Torres BWC 14:55, Torres asks again, "Can you move back?" These are requests, not commands. Lane (not Maxwell or Torres) issued more of a command when he said "step back" multiple times (Lane BWC at 11:30), but Lane's statements must be in the context of the requests from Torres and Maxwell. Lane's repeated statements that "I'm going to put tape up" (Lane BWC at 11:35) add to the ambiguity. Does Lane mean that Pacheco must step back but not until Lane puts the tape up? That is certainly a reasonable interpretation.

But even assuming Lane issued clear commands, they were not lawful. Pacheco was correct—he was standing on a public sidewalk. While officers may in theory need to preserve an accident scene, that was not what was going on here. Pacheco was not obstructing officers from taking pictures of the tire tracks, and there is no evidence officers even cared about the tracks. The conduct of officers prior to arresting Pacheco shows they did not care about preserving tire tracks. The officers themselves walked through the tracks from the moment they arrived at the scene, and they took no steps to prevent other bystanders from standing in that same area. Lane's instructions, as well as Torres' "accident area" justification, were purely pretextual. The issue is not whether officers may ever create a perimeter around an accident scene. The issue is

19

whether, on these facts, a reasonable officer could believe Pacheco committed a crime by standing where officers and bystanders had been permitted to stand and where Maxwell had just told him, "That's fine."[12]

More broadly, the body camera footage shows Pacheco was following officers' instructions, and it was Pacheco's "rude and insolent" manner toward officers that led to his arrest, not his position on the sidewalk. When Pacheco first came to the sidewalk, he was approaching to collect Gerhardt's phone, and Olenik told him to stop. Pacheco obeyed that instruction. Pacheco told Maxwell he could stand on a public sidewalk. Maxwell said, "That's fine." To the extent Lane's "step back" orders were clear and lawful (they were not), officers hardly gave Pacheco time to comply. It was less than two seconds after Torres said "this is an accident area" that Torres handcuffed Pacheco. When Lane said "step back," Pacheco responded, "I can't step back when you're coming closer to me." Lane BWC at 11:35. If Lane and Torres had given Pacheco even a few more seconds, Pacheco could have complied. Instead, Torres invented the idea of an "accident area" as a pretense to turn his request into an order.

While bystanders may not verbally threaten officers, Pacheco was not doing that. At most he was expressing disagreement with the officers' conduct, but bystanders have a right to be "rude and insolent." *Corona v. Aguilar*, 959 F.3d 1278, 1284 (10th Cir. 2020) ("[N]either rudeness nor insolence constitutes resistance or abuse of an

---

[12] Plaintiffs do not contend that officers can never seal off an accident scene on a public sidewalk. Plaintiffs' contention is that if officers choose to seal off a public sidewalk, they must do so consistently and not as an *ad hoc* excuse to arrest someone they do not like.

officer under N.M. Stat. Ann. § 30-22-1(D)"); *see also City of Houston, Tex. v. Hill*, 482 U.S. 451, 461, 107 S. Ct. 2502, 2509, 96 L. Ed. 2d 398 (1987) ("the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."). So do bystanders have the right to observe officers' conduct. *Irizarry v. Yehia*, 38 F.4th 1282, 1286 (10th Cir. 2022) (bystanders have right to videotape officers).

*City of Hobbs v. Wright*, 2022 WL 473701 (N.M. Ct. of App. Feb. 16, 2022),[13] is on point. In *Wright*, a bystander was arrested for REO for refusing to leave the scene of a potential crime. *Id.* at *1. The city argued that the bystander's "fail[ure] to obey the order to leave is alone sufficient to support Defendant's conviction." *Id.* at *4. The appellate court disagreed, reasoning there was no suggestion defendant himself committed a crime. *Id.* Defendant in *Wright* had a right to be on a public sidewalk, and "a verbal challenge unaccompanied by a threat of violence is not unlawful conduct…." *Id.*

With respect to the tampering with evidence charge, there was no probable cause to support this charge, either. As described above, the tire tracks were not "evidence." This was not a murder scene where detectives needed to find the suspect's car. Gerhardt's car was right there. Officers were (quite reasonably) making little effort to photograph the tracks or take samples of the dirt. To the extent the tracks were relevant to anything, other officers and bystanders had long since contaminated them before Pacheco got there. And it is not as if Pacheco was deliberately kicking the dirt.

---

[13] Chacon was the prosecutor in this case, too.

## D. Plaintiffs' malicious prosecution claim may proceed.

Under clearly established law, a state official may not ground a prosecution in statements that were deliberately or recklessly falsified, and in assessing probable cause, false statements must be removed, and material omissions added. *Pierce v. Gilchrist*, 359 F.3d 1279, 1293 (10th Cir. 2004); *Stewart v. Donges*, 915 F.2d 572, 582 (10th Cir. 1990). Here, falsehoods in the criminal complaints against Gerhardt and Pacheco include the following:

| Criminal Complaint Statement[14] | Not true |
|---|---|
| Olenik: "I explained to Alena…I observed indicators of impairment." | Olenik never told this to Gerhardt. |
| Olenik: Gerhardt had "distinct and sustained nystagmus." | Olenik said he observed no nystagmus, and once said "mild" nystagmus. |
| Olenik: "[T]he odor of intoxicating liquor emanat[ed] from her person." | Olenik said the opposite multiple times, as seen on body camera footage. |
| Olenik: "[Gerhardt] started on the wrong foot, proceeded walking, failing to step off line on step 5[15] during the first portion of the test, ending the first portion on the wrong foot. Once she reached her ninth step, [Gerhardt] conducted an improper turn and stopped facing the opposite way….She then took nine steps back, breaking heel to toe on step six of the return portion of the testing." | Not what Olenik said on body camera footage, where he said she just looked annoyed to take the test. Also contradicted by video of the test itself. |
| Lane: Pacheco was "immediately ordered to step back by officers to | When he came to collect Gerhardt's phone, Pacheco was "immediately" |

---

[14] These are located at Dkt. Nos. 65-4, 65-5, 65-7, and 65-8.

[15] This part of Olenik's criminal complaint does not make sense. Olenik says Gerhardt "fail[ed] to step off line on step 5," implying she should have stepped off line on step 5. Olenik changes his story in his Declaration at Paragraph 22 where he says Gerhardt "stepped off line at step 5." Which is it? Was she supposed to step off line or not? The reality is, one can watch the video 100 times. Gerhardt did not do anything unusual or incorrect at step 5. Olenik was just making things up to make it seem like she failed the sobriety test.

| | |
|---|---|
| preserve the tire markings and disturbed dirt streaks across the sidewalk that [Pacheco] was attempting to walk across." | ordered to stop on the sidewalk, which he did. Torres did not come up with the "accident area" idea until later. |
| Lane: "[E]vidence…became disturbed by [Pacheco] walking through the area." | Officers and bystanders had been walking in this area for more than ten minutes. |
| Lane: Pacheco was "repeatedly ordered to step away from the scene." | Maxwell and Torres' statements to Pacheco were not "orders"; they were requests. It was Lane who interrupted Torres and Maxwell and began barking "step back," which was objectively confusing given the statements of Maxwell and Torres, and which Lane had no lawful basis to order. |
| Lane: "Three different officers gave a total of approximately twelve commands for [Pacheco] to step away from the active scene." | Maxwell and Torres' statements were requests, not commands. Lane's statements arguably were commands, albeit commands shouted in quick succession right in Pacheco's face, and overlapping with the requests from Torres. |
| Torres: Pacheco was "immediately ordered to not approach and step away from the area." | When he first approached officers, Pacheco was ordered to stop on the sidewalk and not come closer, which he did. After Pacheco stopped on the sidewalk, Maxwell told Pacheco, "That's fine." |
| Torres: Pacheco "refused to step away several times." | Pacheco obeyed Maxwell's instruction to stop. Torres made requests, not commands. Pacheco was in the course of obeying Lane's "step back" instruction. Indeed, he had already stepped back some on the sidewalk. That was when Torres muttered "this is an accident area" and arrested Pacheco. |

These falsehoods are in addition to the material *omissions* in Olenik's criminal complaint that he did not smell alcohol; he did not detect nystagmus; and he did not view Gerhardt as having failed the sobriety test.

23

If the above false statements are removed and material omissions added, there is no probable cause to prosecute Gerhardt for DWI, and no probable cause to prosecute Pacheco for REO or tampering with evidence. After all, without these false statements, all Defendants are left with is a woman who veered out of the roadway, and a guy standing on a sidewalk, and the primary investigating officer, Olenik, remarking that Gerhardt did not smell of alcohol and did not seem impaired. Defendants correctly cite *U.S. v. Turner*, 553 F.3d 1337 (10th Cir. 2009) (Mot. at 24) for the proposition that so long as there is some other crime for which Gerhardt could have been arrested, Defendants cannot be liable for false arrest. But unlike false arrest claims, as the U.S. Supreme Court explained in *Chiaverini v. City of Napoleon, Ohio*, 602 U.S. 556 (2024), malicious prosecution is offense-specific—that is, if a state official maliciously prosecutes someone for one charge, that there is some other charge the person could be prosecuted for, does not matter.

In *Chiaverini*, a jewelry store owner was charged with three crimes—receiving stolen property (misdemeanor), dealing in precious metals without a license (misdemeanor), and money laundering (felony). *Id.* at 559. Officers supplied an affidavit supporting probable cause on all three counts but focusing on money laundering. *Id.* In their affidavit, officers lied about a number of items including the value of the property and whether the jewelry store owner knew the jewelry at issue was stolen when he accepted it, prerequisites for money laundering. *Id.* Based on the false affidavit, a judge signed an arrest warrant, and the jewelry store owner spent three days in jail. *Id.* at 560. Eventually the prosecutors dropped the charges,

24

and the jewelry store owner sued the officers for malicious prosecution based on the Fourth Amendment under Section 1983. *Id.* The officers argued that even if their affidavit was false as to the money laundering elements, the jewelry store owner was still guilty of the two misdemeanors, so officers could not be liable for malicious prosecution. *Id.* The Supreme Court rejected this argument, holding that "if an invalid charge—say, one fabricated by police officers—causes a detention either to start or to continue, then the Fourth Amendment is violated." *Id.* at 563.

In this case, under *Chiaverini*, even if Gerhardt could be prosecuted for reckless driving or some other traffic infraction, that does not mean she can be wrongfully prosecuted for DWI. Gerhardt's case is even more pronounced than *Chiaverini* as Gerhardt was never charged with reckless driving, only DWI. That Gerhardt could hypothetically have been prosecuted for some other crime is irrelevant under *Chiaverini*.

### E. The collective knowledge concept does not help Defendants.

Defendants cite the police-team, or collective knowledge, concept in defense of officers' actions (Mot. at 26, *et seq.*), but Defendants do not explain how this helps them. As Defendants point out, the collective knowledge doctrine concerns instances where "no single officer possesses information sufficient for probable cause" (horizontal), or where "an officer having probable cause…instructs another officer to act, even without communicating all of the information necessary to justify the action" (vertical). Mot. at 26-27. Neither fits the current situation. Olenik had the same information as did Maxwell, Torres, and Lane—in fact, he had more

25

information than those officers—so horizontal knowledge does not apply. There is no other officer with probable cause who instructed Olenik to act. Olenik was the first officer to the scene, and he spent more time around Gerhardt than any of them, even spending more than a minute two feet in front of her mouth administering the HGN test. Further, even crediting Maxwell's supposed smelling of alcohol on Gerhardt, she never relayed this information to Olenik. Olenik was gone when Maxwell made this statement. Olenik cannot rely on a statement he never heard.

Defendants might have a point if Lane perceived some act during the sobriety test that Olenik missed, but that is not what happened. Olenik and Lane were watching the same test—Olenik more closely because Lane left halfway through. When Lane started listing potential failures by Gerhardt, it is a reasonable inference he was merely spit-balling, stream-of-conscious style, trying to come up with some excuse to say Gerhardt failed the test, an assessment with which Olenik already said he disagreed. Lane's observations about Gerhardt's supposed poor performance were not even true as can be seen from the body camera footage.

In sum, collective knowledge permits officers to rely on facts actually and truthfully communicated by *other officers*. It does not permit an officer to rewrite his own observations, to make false statements, or to "rely" on statements he never heard. *See Franks v. Delaware*, 438 U.S. 154, 164, n.6 (1978) ("[P]olice [cannot] insulate one officer's deliberate misstatement merely by relaying it through an officer-affiant personally ignorant of its falsity."); *U.S. v. Shareef*, 100 F.3d 1491, 1504 (10th Cir. 1996) ("We can see the value in imputing knowledge among officers

working closely together….However…the presumption of communication is rebutted, because the district court found that in fact the information had not been shared.").

### F. At most, fact issues preclude summary judgment on Plaintiffs' false arrest and malicious prosecution claims.

Did Gerhardt really have slurred speech?  Did she actually step out during the sobriety test?  Why did Olenik go from "no nystagmus" and "don't smell anything" and "she's just annoyed she has to take the test," to arresting Gerhardt for DWI?  How did Torres, who was at least 20 feet away from Gerhardt, smell alcohol on Gerhardt's breath when Olenik, who was right next to Gerhardt, did not?[16]  Did Torres arrest Pacheco because he was disobeying a lawful order, or because he was "rude and insolent" toward officers?  Did Torres (or any officer) actually order Pacheco to leave the sidewalk?  If so, did Pacheco comply, and did officers give Pacheco sufficient time to comply?

At most, these are fact questions.  Drawing all inferences for Plaintiffs as the Court must do, summary judgment is inappropriate for these additional reasons.

### G. Summary judgment is improper on Plaintiffs' Sixth Amendment claims.

Plaintiffs will separately respond to Chacon and the DA Office's motions for summary judgment, and Plaintiffs incorporate those arguments herein.[17]  The basis

---

[16] *See* Torres BWC at 12:20, where Torres claims he smelled alcohol on Gerhardt's breath, and Olenik, who was much closer to Gerhardt, responded that he did not.
[17] Defendants say they are confused about whether the Sixth Amendment claim is being asserted against Lane and Olenik (Mot. at 16), but it is clear from the Complaint that the Sixth Amendment claim is against Chacon and the City.  *See* Dkt. #1 at ¶153.

for Plaintiffs' claim is simple:  (1) Plaintiffs were represented by counsel; (2) Chacon knew Plaintiffs were represented by counsel; (3) Chacon knew the identity of Plaintiffs' counsel and had indeed exchanged several emails with Plaintiffs' counsel about the criminal charges at issue; (4) on December 30, 2024, the City emailed Plaintiffs' counsel that the cases were "closed on our side."  and yet (5) Chacon filed criminal charges against Plaintiffs (on which a first appearance was scheduled for January 7, 2025), without notifying Plaintiffs' counsel.  In this way, Chacon knew Plaintiffs were represented by counsel and knew those counsel's identity yet placed Plaintiffs in peril anyway.

Defendants cite much authority about the Sixth Amendment (Mot. at 16-18), but fail to explain why they think this authority helps them.  Under *Rothgery v. Gillespie Cnty., Tex.*, 554 U.S. 191 (2008), Plaintiffs' right to counsel began at the first formal proceeding against them.  *See also Kirby v. Illinois*, 406 U.S. 682, 689 (1972) (plurality opinion) ("The right to counsel attaches at the initiation of adversarial proceedings…whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.").  Here, the first such proceeding was in municipal court on October 31, 2024, where Mr. Gubernick appeared for Plaintiffs.  Defendants characterize the later district court proceeding as an "appeal" of the municipal proceeding (Mot. at 16), which is not strictly accurate,[18] but either way, the right to counsel had attached two months prior to when the Fifth Judicial District filed the

---

[18] There was never a merits determination in the municipal court, so there was nothing to appeal.

criminal informations on December 31, 2024. The City actively undermined Plaintiffs' right to counsel by, *inter alia*, (i) informing counsel on December 30 the case was closed, (2) filing the criminal informations on December 31, and (3) filing a motion to expedite the trial.

As to prejudice, this is not a criminal case where a defendant was convicted and the Court must determine whether he was prejudiced by ineffective or absent counsel. Criminal charges against Plaintiffs were (eventually) dismissed, so they were not prejudiced in that respect. Defendants' argument is really that denial of counsel caused no damages to Plaintiffs, that Chacon was caught before she could do any damage, and that Plaintiffs would only have sustained damages if they went to jail or otherwise suffered on account of Chacon's actions. But this is not right. Plaintiffs have pled emotional distress damages as a result of being subjected to peril due to Chacon's surreptitiously filed criminal informations. Imagine the horror Plaintiffs experienced when they thought this incident was behind them, only for undersigned counsel to inform Plaintiffs that the City's prosecutor had gone behind counsel's back and filed new charges against them in another court, and a hearing was scheduled for an hour from now that may result in warrants being issued for Plaintiffs' arrest. At a minimum, Plaintiffs are entitled to nominal damages for this claim.

### H. Summary judgment is improper on Plaintiffs' NMCRA and NMTCA claims.

For the same reasons Defendants had no probable cause to arrest and prosecute Plaintiffs under the Fourth Amendment, summary judgment is inappropriate on Plaintiffs' state law NMCRA and NMTCA claims. To the extent the Court finds

qualified immunity to bar Plaintiffs' recovery on their federal claims, Defendants have no qualified immunity under the NMCRA or NMTCA, so those claims should be permitted to proceed. Defendants' state law arguments are wrong for the following additional reasons:

### 1. Article II, Section 4 Claim

Defendants are correct that Article II, Section 4 has never been the ***exclusive*** source for a constitutional right, but this hardly means Plaintiffs' Section 4 claim is "unenforceable." Mot. at 16. "Not exclusive" does not mean "unenforceable," and Defendants cite no authority for this proposition. The authority Defendants cite predates the NMCRA, enacted in 2021, in which the New Mexico legislature afforded New Mexicans with a private right of action to enforce their state constitutional rights. Pre-2021, it did not make much difference whether Section 4 was an independent source of rights. New Mexico courts are currently engaged in the task of defining the contours of Section 4. Yet Defendants suggest that this Court prevent them from doing that and preemptively declare no one may bring any claim under Section 4, ever—on summary judgment, no less. Plaintiffs urge the Court not to adopt such an extreme position.

### 2. Article II, Section 10 Claim

Similar to its Section 4 argument, Defendants say that because New Mexico appellate courts have not elucidated the elements of a state law malicious prosecution claim, it must not exist, but again, Defendants' logic is not sound. Article II, Section 10 of the New Mexico Constitution states in full:

> "The people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures, and no warrant to search any place, or seize any person or thing, shall issue without describing the place to be searched, or the persons or things to be seized, nor without a written showing of probable cause, supported by oath or affirmation."

This language is similar to that in the Fourth Amendment to the U.S. Constitution. As described above, the U.S. Supreme Court has long held malicious prosecution to be a seizure for purposes of the Fourth Amendment, and New Mexico state courts have never held otherwise. The NMCRA is only five years old, so it makes sense appellate courts have not had the opportunity to analyze the question. To the extent pre-NMCRA authority is available, it suggests New Mexico appellate courts would agree with federal courts and recognize a malicious prosecution claim under Article Two, Section Ten. See *Benavidez v. Shutiva*, 2015-NMCA-065, ¶ 10 (discussing federal law and state tort law together and recognizing Tenth Circuit Fourth Amendment malicious-prosecution claims are tied to unreasonable seizures after legal process, and noting that New Mexico tort law separately uses the malicious-abuse-of-process framework).[19]  Reading *Benavidez*, there is no reason to think New Mexico appellate courts would not come to the same conclusion as federal appellate courts.

*3.  NMTCA Claim.*

Defendants concede their NMTCA arguments rise and fall with probable cause. N.M. Stat. 41-4-12 waives immunity for false arrest, false imprisonment, malicious

---

[19] *Benavidez* sets forth the elements of a NMTCA claim for malicious prosecution (*id.* at ¶20), and Defendants do not dispute that such a claim exists.

prosecution, abuse of process, and battery caused by law enforcement officers. Because a reasonable jury could find Plaintiffs were arrested and prosecuted without probable cause, and because qualified immunity is unavailable under the NMTCA, summary judgment on those claims must be denied.

## V.    CONCLUSION

For the above reasons, Plaintiffs respectfully request the Court deny Defendants' Motion.  Plaintiffs seek all other relief to which they may be entitled at law or equity.

June 5, 2026

Respectfully submitted,

WGLA, LLP

_/s/ Curtis Waldo_____
Benjamin Gubernick
Curtis Waldo
WGLA, LLP
717 Texas Aven. Suite 1200
Houston, TX 77002
ben@wglawllp.com
curtis@wglawllp.com
(346) 277-0287
(346) 394-8056
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing document on opposing counsel on June 5, 2026.

_/s/ Curtis Waldo_____
Curtis Waldo